J-S17038-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICAH ANTHONY GOVENS, | |
| Appellant | No. 1673 EDA 2016 |

Appeal from the Judgment of Sentence of April 27, 2016
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0000147-2016

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICAH ANTHONY GOVENS, | |
| Appellant | No. 1683 EDA 2016 |

Appeal from the Judgment of Sentence of April 27, 2016
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0002608-2015

BEFORE:  OLSON, STABILE and MUSMANNO, JJ.

DISSENTING MEMORANDUM BY OLSON, J.:          **FILED MAY 22, 2017**

As I believe that the suppression court properly denied Appellant's motion to suppress, I must respectfully dissent.

I agree with the learned Majority that, at the time Officer Kevin Schiller and Officer Roosevelt Turner stopped Appellant, Appellant was subject to an investigative detention. I also agree that the law is clear that

police officers may conduct an investigative detention only if they have reasonable suspicion that criminal activity is afoot. ***Commonwealth v. Foglia***, 979 A.2d 357, 360 (Pa. Super. 2009) (*en banc*) ("A police officer may detain an individual in order to conduct an investigation if the officer reasonably suspects that the individual is engaging in criminal conduct.") Thus, the issue in this case is whether Officer German Sabillon possessed reasonable suspicion that Appellant was engaged in criminal conduct when he directed his fellow officers to stop Appellant. I conclude that he did, therefore, I believe that Appellant's detention was lawful and that the evidence seized upon the search of Appellant's person should not be suppressed.

As is well established:

> In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to the examination of only those facts that clearly indicate criminal conduct. Rather, a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Id.*** (citations and internal quotes omitted).

In this case, the evidence adduced at the suppression hearing established the following. Officer Sabillon, a patrol officer for the City of Chester Police Department for 11 years, received a call on January 10, 2015 at approximately 1:34 a.m. dispatching him to the Gold Room, a bar located

in Chester City. N.T., 8/25/15, at 7-8. The dispatch indicated that a large group of individuals was fighting in the street in front of the bar. *Id.* at 10. The Gold Room is located near a high-crime area. *Id.* at 12. Officer Sabillon indicated that officers are to be in the area of the Gold Room on Fridays, Saturdays and sometimes Sundays because of the large crowds. *Id.* at 10. According to Officer Sabillon, his department typically patrols the location at the bar's closing time "[b]ecause of the problems." *Id.* at 13. The officers usually block the street that leads to the bar to get everyone out of the area as quickly as possible. *Id.* Officer Sabillon responded to the Gold Room on many occasions because of various disturbances, including fights and assaults. *Id.* at 11. In fact, just one week before this incident, Officer Sabillon encountered another person with a gun outside the bar. *Id.* In his personal experience, Officer Sabillon conducted approximately 20 arrests inside and outside the Gold Room since it opened. *Id.* at 11-12. Those arrests included firearm violations, violent offenses and drug offenses. *Id.* at 12.

On the night in question, the entire shift (approximately eight officers) and one officer from a neighboring jurisdiction were present at the Gold Room location. *Id.* at 13. When Officer Sabillon arrived, there was a crowd of approximately 50 people gathered outside the bar. *Id.* at 13-14. A group of females was fighting in the middle of the street. *Id.* at 14. The officers were directing the crowd to disperse. *Id.* at 45. Although the officers were

yelling to the crowd to disperse, Appellant refused to move from the front of the bar. *Id.*

Officer Sabillon was in the area near the front of the bar when a female, who was getting into her car, called him over. *Id.* at 14. "As [he] approached, [the woman] said the man right there, kind of like pointed and gave [Officer Sabillon] a general description, has a gun. He put a gun into his pocket, she said." *Id.* The man at which the woman pointed was Appellant. *Id.* at 15. Officer Sabillon testified that lights from the bar made the area bright; therefore, he could clearly see the woman when she talked with him and Appellant after the woman pointed to him. *Id.* at 15-16. The woman was calm when she spoke to the officer. *Id.* at 18. Officer Sabillon was more willing to act on the tip provided by this woman since he had a "person-to-person" encounter with her. *Id.* at 20. As he testified, "[i]n the City of Chester, it's rare for someone to get involved like that. They usually call and don't give their name but not a person-to-person . . . encounter, so that kind of made me . . . act more towards the information given." *Id.* At all times that Officer Sabillon saw Appellant, Appellant's hands were in his coat pockets. *Id.* at 57. When asked whether the fact that Appellant had his hands in his pockets at all times supported the tip from the woman, Officer Sabillon testified "Possibly, yes." *Id.* at 26. After speaking with the woman, Officer Sabillon radioed to Officers Schiller and Turner and asked

them to stop Appellant. *Id.* at 21. Once detained, Officer Sabillon found a firearm in the right pocket of Appellant's coat. *Id.* at 66.

Officer Sabillon testified that he acted upon the woman's tip because of the shootings and gun arrests from the area. *Id.* at 20. He was concerned about the safety of the crowd and his fellow police officers, especially since there were a lot of people, a fight was occurring, and alcohol was involved. *Id.* at 20-21.

After considering these facts in a light most favorable to the Commonwealth[1], I believe that the totality of the circumstances establish that Officer Sabillon had reasonable suspicion to believe that Appellant was engaged in criminal conduct at the time he asked his fellow officers to detain Appellant. Thus, the investigative detention of Appellant was constitutionally sound and the seizure of the gun and drugs from his person was proper.

This case is almost on all-fours with *Commonwealth v. Ranson*, 103 A.3d 73 (Pa. Super. 2014), *appeal denied*, 103 A.3d 73 (Pa. 2015). In *Ranson*, officers were working an approved off-duty detail at an after-hours club in a high-crime area in Pittsburgh. Security was needed at the club as there were prior incidents at the club, including fights, shootings and

---

[1] "Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010), *cert. denied*, 131 S. Ct. 110 (2010).

homicides. On the night in question, as the club was letting out at approximately 3:30 a.m., a frequent patron of the club stopped one of the officers and told him there was a male on the corner with a firearm. The patron went on to describe the male as wearing a black hoodie, black jeans and having a long beard. "The patron actually pointed the person out to [the officer] on the corner." *Id.* at 75. In light of this information, the officer who received the tip, along with two other officers, approached Ranson. As they did so, Ranson put his hands in his hoodie pocket and started to walk away at which time he was commanded by the officers to stop. Once Ranson eventually stopped, he removed his hands from the hoodie pocket and the officers could see the imprint of a gun. The officers searched Ranson and recovered a firearm from the front pocket of his hoodie sweatshirt. Ranson sought to suppress the gun on the basis that the officers lacked reasonable suspicion to detain him. The trial court denied the motion and Ranson was convicted of various crimes, including firearms violations. On appeal, this Court affirmed the trial court's order denying the motion to suppress.

Similar to the argument made in the case *sub judice*, Ranson argued that the officers lacked reasonable suspicion that he was engaged in criminal conduct at the time he was detained. Specifically, Ranson argued that the tipster was purely anonymous as the officer did not know the tipster's name. As such, the tip could not be used to establish reasonable suspicion. In

rejecting Ranson's argument, this Court distinguished the various cases in which an anonymous, vague tip was found to be insufficient to create a reasonable suspicion of criminal activity, including ***Commonwealth v. Hawkins***, 692 A.2d 1068 (Pa. 1997) and ***Commonwealth v. Haywood***, 756 A.2d 23 (Pa. Super. 2000), two of the cases upon which the learned Majority relies. Instead, the ***Ranson*** Court found that the officer received the tip in person from a patron at the club and that the tip was not vague since the tipster not only described Ranson, but he pointed him out to the officer. The ***Ranson*** Court found that "[t]aken together, the facts show that Detective Curry, a veteran officer, had an opportunity to assess: (1) the demeanor of the tipster; (2) the basis of the tipster's knowledge; and, (3) the tipster's present ability to perceive [Ranson]. These facts give additional credence to the tipster's information." ***Id.*** at 79. ***See also Commonwealth v. Williams***, 980 A.2d 667, 672 (Pa. Super. 2009), *appeal denied* 990 A.2d 730 (Pa. 2010) ("The situation here is distinguishable in that the tip was made in person giving [the officer] an opportunity to observe the witness' demeanor and assess his credibility in light of this past experience with investigating crimes. Such a tip must be given more weight than a mere anonymous phone call . . .".)

Like in ***Ranson*** and ***Williams***, Officer Sabillon had the opportunity to observe the tipster's demeanor and assess her credibility in light of his 11 years of experience as a police officer. Officer Sabillon could clearly see the

woman who provided the tip and noticed her calm demeanor. He noted the lighting conditions and confirmed that the woman was able to perceive Appellant as she was in close proximity to him. Additionally, Officer Sabillon stated that he was more inclined to believe the woman as it was rare for people in that community to get involved and provide in-person information to the police. Thus, the tip given to Officer Sabillon was a legitimate factor upon which the officer could rely in determining that there was reasonable suspicion to stop Appellant.[2]

Moreover, just like in **Ranson**, there were additional facts that must be considered in viewing the totality of the circumstances from the eyes of Officer Sabillon. The Gold Room is located near a high-crime area and the bar was the site of prior incidents, including firearm violations, violent crimes and drug offenses. Since the Gold Room opened, Officer Sabillon personally arrested approximately 20 individuals inside or outside the bar. In fact, just one week prior to this incident, Officer Sabillon encountered another person

---

[2] The fact that the woman told Officer Sabillon that she saw Appellant put a gun into his pocket is an even more compelling justification to order the stop as the statement reveals that Appellant possessed a visible firearm at a bar late at night in a high-crime area where a physical altercation was occurring. Under these circumstances, Officer Sabillon had reasonable cause for concern regarding the safety of the investigating officers and the departing bar patrons. **See Terry v. Ohio**, 392 U.S. 1 (1968) (police officer may search individual's outer clothing to discover weapons which might endanger officer or others if officer observes unusual and suspicious conduct on the part of the individual which leads him reasonably to conclude that criminal activity may be afoot and that the individual may be armed and dangerous).

outside of the Gold Room who had a gun. "Thus, there was a credible basis from which the officers could infer that the people in and near the club had weapons." *Ranson*, 103 A.3d at 80. Like in *Ranson*, officers from the Chester City Police Department, including Officer Sabillon, were assigned in the past to patrol the area outside the Gold Room at closing time to make sure things remained calm and peaceful. On the night in question, there were approximately 50 people outside the bar and a group of women was fighting. Nine police officers were trying to control the situation and disperse the crowd by directing everyone to leave. Although told to disperse, Appellant refused to leave and remained standing outside of the bar. At all times that he was observed by Officer Sabillon, Appellant had his hands in his coat pockets. Each of these factors, standing alone, may not be sufficient to establish reasonable suspicion; however, taken in their totality, they are sufficient to have reasonably led Officer Sabillon to believe that criminal activity was afoot so as to justify the investigative detention of Appellant. Thus, in considering the totality of the facts and circumstances, and after applying our standard of review[3], I must conclude that the trial

_____

[3] "Our standard of review in addressing a challenge to the denial of a suppression motion is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. . . . Where the suppression court's factual findings are supported by the record,

*(Footnote Continued Next Page)*

court did not err in denying Appellant's suppression motion. Hence, I must respectfully dissent.

---

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯

we are bound by those findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review."

**Ranson**, 103 A.3d at 76, *quoting* **Jones**, 988 A.2d at 654 (citations, quotations and ellipses omitted).